BILLIE R. WESTBROOK AND MADELINE M. WESTBROOK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Westbrook v. Commissioner
Docket No. 21542-91
United States Tax Court
T.C. Memo 1993-634; 1993 Tax Ct. Memo LEXIS 655; 66 T.C.M. (CCH) 1823; December 29, 1993, Filed *655 Ps owned two farms, Burton and Billenbrook. In the late 1970s, oil was discovered on Burton and Ps signed a lease permitting WCS to drill there for oil. During the years in issue, Ps neither kept animals at Burton nor performed farming operations there. Ps' activities at Billenbrook generally consisted of raising cattle and miniature horses. Ps reported net losses from Billenbrook's operations for 8 consecutive years, including the years in issue. B, an S corporation owned 100 percent by Ps, had its principal place of business on Billenbrook. B's operations included breeding and raising purebred dogs and maintaining pygmy goats. In February 1985, the S corporation sold its entire stock of dogs and ceased the dog operation. Later in 1985, Ps donated the entire stock of pygmy goats to a charitable organization. Ps kept one checking account for all of their activities, except B, for which they maintained a separate account. Some expenses related to Ps' individual Federal income tax returns were reported and deducted on B's Federal income tax returns. Similarly, some of B's expenses were deducted on Ps' returns. Ps' son (S) received taxable wages from B during the years *656 in issue for services he provided to B and to other operations of Ps. S also attended classes full time at a school 4 to 5 hours' drive from Billenbrook. B reimbursed S for these educational expenses. Held: Ps were not engaged in a trade or business on Burton during the years in issue. Held further: Ps did not operate Billenbrook for profit during the years in issue. Held further: The activities of B after February 1985 were not engaged in for profit. Held further: The deductions taken by B after February 1985 were not for ordinary and necessary business expenses. Held further: Certain compensation paid to S by B and disallowed by respondent is not properly deductible. Held further: Payments made by B to S to reimburse him for educational expenses are not properly deductible. Held further: B is not entitled to deductions erroneously reported on its return that related to various other activities of Ps. Held further: Ps are not entitled to deductions related to their royalty interest in oil and gas produced on Burton. For petitioners: Juan Jose Perez and James H. Balthaser. For respondent: Lillian D. Brigman and Andrew M. Tiktin. LARO
LARO
*657 MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: This case is before the Court pursuant to a petition filed by Billie R. Westbrook and Madeline M. Westbrook (petitioners) for redetermination of respondent's determinations reflected in her notice of deficiency. Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Additions to Tax
Sec.
Sec.
Sec. Year
Deficiency
6653(a)(1)
6653(a)(2)
6653(a)(1)(A)
1984
$ 117,744.62
$ 5,887.23
[1]
--
1985
163,449.20
8,172.46
[1]
--
1986
90,057.00
--
--
$ 4,502.85
1987
12,548.55
--
--
627.28
Additions to Tax
Sec. Sec.
Sec. Year
6653(a)(1)(B)
6659
6661 1984
--
-- $ 29,436.16
1985
--
$ 21,705
[2]
1986
[1]
6,300
[2]
1987
[1]
--
3,137.14
Hereinafter, Billie R. Westbrook is referred to as Dr. Westbrook, and Madeline M. Westbrook is referred to as Mrs. Westbrook. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references *658 are to the Tax Court Rules of Practice and Procedure. After concessions, [1] the issues for decision are: (1) Whether petitioners were engaged in a trade or business on Burton Farm during the years in issue. We hold they were not. (2) Whether petitioners operated Billenbrook Farm for profit under section 183(a) during the years in issue. We hold they did not. (3) Whether the activities of Billenbrook Farms, Inc., a subchapter S corporation, after February 1985 were engaged in for profit. We hold they were not. (4) Whether the deductions taken by Billenbrook Farms, Inc., after February 1985 were for ordinary and necessary business expenses under section 162. We hold they were not. (5) Whether certain compensation paid by Billenbrook Farms, Inc., to petitioners' son, William R. Westbrook (William) in 1985 and 1986 is properly deductible. We hold it is not. (6) Whether payments by Billenbrook *659 Farms, Inc., to William in 1985 and 1986 to reimburse him for educational expenses are properly deductible. We hold they are not. (7) Whether Billenbrook Farms, Inc., is entitled to deductions related to various activities of petitioners that were reported on Billenbrook Farms, Inc.'s Forms 1120S for 1985 and 1986. We hold it is not. (8) Whether petitioners are entitled to deductions related to their royalty interest in oil and gas produced on Burton Farm. We hold they are not. (9) Whether petitioners are liable for additions to tax for negligence under section 6653. We hold they are. (10) Whether petitioners are liable for additions to tax for substantial understatements of tax under section 6661. We hold they are. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by this reference. During the years in issue, petitioners were husband and wife. They filed their 1983 through 1987 returns using the filing status "Married filing joint return". At the time they filed their petition, petitioners resided in Houston, Texas. Petitioners' Backgrounds
Dr. Westbrook was born *660 and raised in the rural town of Luling, Texas. He has been a veterinarian since 1955. In 1962, he founded the Spring Branch Veterinary Clinic (the Clinic), a private clinic in Spring Branch, Texas; during the years in issue, the Clinic's annual gross receipts were approximately $ 729,400. During the years in issue, Dr. Westbrook worked at the Clinic full time. In addition, Dr. Westbrook was on call 24 hours a day, 7 days a week, and often was required to be at the Clinic after normal business hours. Mrs. Westbrook was also born and raised in Luling, Texas. Mrs. Westbrook married Dr. Westbrook in December 1952, and they had three sons. Her primary role in the family's business activities was to promote veterinary medicine and market the Clinic. She has performed services for the Clinic without compensation since the day it opened. After petitioners' children were in school, Mrs. Westbrook took continuing education courses in advertising, marketing, and public relations. She also handled public relations for the Texas Veterinary Medical Association. Mrs. Westbrook was a successful publicist, and she was able to obtain free publicity for the Clinic partly by using petitioners' *661 animals. Burton Farm
In October 1976, petitioners purchased a 299.2-acre farm with mineral rights in Lee County, Texas (Burton Farm). In late 1976 and early 1977, after investigating the cattle business, petitioners commenced a cattle-raising operation by acquiring 20 Angus cows and 1 Angus bull. Petitioners did not have a business plan for the cattle-raising operation. They did not keep detailed records pertaining to the cattle. In April 1983, petitioners sold their herd of approximately 90 cattle and ceased their cattle operation at Burton Farm. During the years in issue, petitioners neither kept animals at Burton Farm nor performed farming operations. Petitioners reported net losses for farming operations at Burton Farm for the taxable years 1976 through 1987. Oil and Gas
In the late 1970s, oil was discovered on Burton Farm, and petitioners commenced oil and gas production in commercial quantities. On August 16, 1983, petitioners entered into a lease agreement for WCS Petroleum Co. (WCS) to produce and drill for oil on Burton Farm. In exchange for a royalty, the lease agreement gave WCS: (1) The exclusive right to explore, drill, and produce oil and gas *662 on Burton Farm and (2) an oil and gas lease on Burton Farm "to produce, save, take care of, treat, process, store and transport said [oil and gas]". Petitioners reported net income from oil and gas operations on Burton Farm for the same period for which they reported net losses from farming operations at Burton Farm. No oil was stolen from Burton Farm while WCS was the lessee. One deterrent to oil theft is perimeter fencing with limited entrances, gates, and combination locks. The perimeter fence on Burton Farm is typical of ranches and was not upgraded to prevent potential thieves from entering the property. Since petitioners purchased Burton Farm in 1976, the only change they made to the fence was to repair it to keep cattle inside. Under the lease agreement, petitioners were required to submit a written claim to WCS in order to be reimbursed for certain physical damages to petitioners' property. Petitioners did not submit any claims for covered damages to WCS. Petitioners arranged for Danny Nowell, a production manager with WCS, to look after the Burton Farm property and the oil wells; in 1983 or 1984 he moved into the house located on the property and moved out sometime *663 between 1985 and 1987. Billenbrook Farm
In 1980, petitioners purchased a 211-acre farm in Austin, Texas (Billenbrook Farm). Petitioners did not calculate the number of years it would take them to recoup their investment in Billenbrook Farm and the livestock they planned to keep there. William prepared a "preliminary business plan outline" stating: "The purpose of this venture is to build capital assets with the limited physical involvement of the principals." The "principals" included himself and petitioners. Petitioners considered living on Billenbrook Farm and hired Raymond Reed to design a house for them. He drew at least five versions of the plans for the house. The house would have had two floors, including a gym with a jacuzzi, and would have had a view of the lake. Petitioners abandoned the idea of building a house on Billenbrook Farm because their many activities kept them from spending time there. Petitioners' Billenbrook Farm activities generally consisted of raising cattle and miniature horses. Petitioners reported net losses from operations of Billenbrook Farm during 1980 through 1987. Petitioners investigated and then engaged in a form of cattle raising *664 known as "embryo transplants" from 1982 through 1984 on Billenbrook Farm. In 1982, petitioners purchased two Angus donor heifers to use in the embryo transplant process. Petitioners maintained 14 to 16 cattle on Billenbrook Farm during 1984. Petitioners ceased embryo transplants because they were losing money from it. Petitioners maintained 18 to 20 cattle on Billenbrook Farm through 1987. In 1983, petitioners investigated the miniature horse business and purchased 27 miniature horses, of which 24 were registered with the American Miniature Horse Association or the International Miniature Horse Association. Petitioners did not make any written financial projections with respect to the miniature horses or calculate how long it would take to recoup their investment in the horses. They did not insure the horses except when they moved them. Petitioners also did not keep records of when the horses were fertile or perform pregnancy examinations on the horses. Petitioners never mated any of their horses with anyone else's stud or offered their stallions' stud services to horses owned by others. Through August 1985, petitioners' miniature horses bore three foals. Petitioners entered *665 some of the miniature horses in horse shows, some of which won several ribbons. Petitioners placed an advertisement in the June/July 1985 edition of Miniature Horse World, but petitioners never sold any of their horses. The advertisement lists petitioners' address as care of the Clinic. In August 1985, petitioners donated their entire herd of miniature horses to a tax-exempt organization. Petitioners claim they intended to earn a profit from Billenbrook Farm equal to the profit from the Clinic. However, early in the years in issue, petitioners decreased the time spent at Billenbrook Farm. Petitioners eventually ceased operations on Billenbrook Farm because they had discovered oil on Burton Farm, which had caused a "drastic change" in their lives. In addition, petitioners needed to put their time and energy into the Clinic. Billenbrook Farms, Inc.
On January 18, 1982, petitioners formed Billenbrook Farms, Inc., a subchapter S corporation, with its principal place of business on the Billenbrook Farm property. Dr. Westbrook owned 100 percent of the stock of Billenbrook Farms, Inc., during the years in issue. All expenses incurred by Billenbrook Farms, Inc., were funded *666 by cash petitioners contributed to the corporation's capital or advanced to it as a loan. Petitioners reported net losses from Billenbrook Farms, Inc., during the taxable years 1983 through 1986. Billenbrook Farms, Inc., had no gross receipts during the taxable year 1986. The operations of Billenbrook Farms, Inc., during the years in issue included breeding and raising purebred dogs and maintaining pygmy goats. When Billenbrook Farms, Inc., commenced its dog-breeding operation, petitioners carefully selected puppies that they planned to raise to maturity before breeding. In late 1984, petitioners determined that, in order to make a profit from the dog-breeding operation, they would have to drastically increase their stock of dogs. Petitioners determined that such an increase would also increase the amount of time Dr. Westbrook spent at Billenbrook Farm rather than at the Clinic. In February 1985, Billenbrook Farms, Inc., sold its entire stock of dogs and ceased the dog operation. Billenbrook Farms, Inc., raised pygmy goats as an ancillary operation to the horse breeding. Billenbrook Farms, Inc., did not maintain breeding records for the pygmy goats. Mrs. Westbrook took the *667 goats to nursing homes, schools, and petting zoos. Billenbrook Farms, Inc., did not sell any pygmy goats. No later than September 5, 1985, petitioners donated the entire stock of pygmy goats to a charitable organization. From 1983 until approximately July 1985, Billenbrook Farms, Inc., employed Marek Bartosik, who maintained the farm and its animals. In 1985, petitioners hired Willie East to feed the cattle on Billenbrook Farm once every 3 days. Billenbrook Farms, Inc., paid Willie East from February 1985 through December 1986. Dr. Westbrook paid him thereafter. Petitioners' Records
Except for Billenbrook Farm, for which William drew up a preliminary outline, petitioners never had formalized business plans for any of their activities. During the taxable years 1984 through 1986, petitioners did not always separate the bookkeeping of each venture. Petitioners kept one checking account for all of their activities, except Billenbrook Farms, Inc., for which they maintained a separate account. Dr. Westbrook annotated each check with a description of the relevant activity, such as "Burton" or "Billenbrook", and sent the check to petitioners' accountant, John Braden (Braden). *668 Braden entered the information on these checks into a computer program, which compiled profit and loss statements and a balance sheet for each of petitioners' activities. These statements were replete with errors that petitioners did not correct. As a result, some expenses related to petitioners' individual Federal income tax returns were reported and deducted on the Federal income tax returns of Billenbrook Farms, Inc. Similarly, some expenses relating to Billenbrook Farms, Inc., were deducted on the Schedule F for Burton Farm or Billenbrook Farm. William Westbrook
William received taxable wages from June 11, 1984, through August 20, 1986 (the Employment Period), from Billenbrook Farms, Inc. He received $ 50,341 for 1984, $ 45,402 for 1985, and $ 34,387 for 1986. During the Employment Period, William provided services to Billenbrook Farms, Inc., during its operating existence, and to other operations of petitioners. In part, he rendered services related to the dog-breeding operation conducted by Billenbrook Farms, Inc., and compiled a schedule of the activities of the animals kept on Billenbrook Farm. He also assisted in finding veterinarians for the Clinic, making *669 repairs at the Clinic, and managing the reporting of the oil and gas revenue. William considered the Clinic "the engine that was running the other investments". During the Employment Period, from August 15, 1985, through August 16, 1986, William attended classes full-time at Southern Methodist University (SMU). During the year that William attended classes at SMU, his primary and nearly exclusive function was to learn as much as possible. Petitioners thought it would benefit their investments, particularly outside the animal-breeding activities, for their son to attend these classes. While at SMU, William occasionally advised petitioners on how to invest their capital. Billenbrook Farms, Inc., reimbursed William for educational expenses incurred at SMU in the amounts of $ 4,800 and $ 10,199 during the 1985 and 1986 taxable years, respectively. Billenbrook Farms, Inc., deducted those amounts. SMU is 4 to 5 hours' drive from Billenbrook Farm. William did not keep a record of what time he devoted to Billenbrook Farms, Inc. While at SMU, William took advantage of the school's career placement office. He interviewed with Leslie Wexner Investments and accepted a position there *670 beginning after his graduation in 1986. OPINION Burton Farm
Respondent determined that petitioners' animal activity on Burton Farm was not a trade or business under section 162. We agree. For an activity to constitute a trade or business under section 162, it must be engaged in with continuity and regularity and with the primary purpose of realizing income or profit therefrom. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); see also Brannen v. Commissioner, 78 T.C. 471, 501 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Petitioners' animal activity does not meet this standard. During the years in issue, petitioners neither kept animals at Burton Farm nor performed farming operations. Instead, petitioners engaged primarily in oil and gas production. Billenbrook Farm
Respondent determined that Billenbrook Farm was not an activity engaged in for profit under section 183. Again, we agree. Section 183 generally limits the amount of expenses that may be deducted with respect to an activity "not engaged in for profit". Sec. 183(a). For this purpose, an activity is "not engaged *671 in for profit" if deductions are not allowable for the taxable year under section 162 or section 212(1) or (2). Sec. 183(c). The test for determining whether a taxpayer conducted an activity for profit is whether the taxpayer entered into, or continued, the activity "with the actual and honest objective of making a profit". Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be reasonable; however, he or she must have a good-faith objective of making a profit. Allen v. Commissioner, 72 T.C. 28, 33 (1979); Ranciato v. Commissioner, T.C. Memo. 1993-536; Holbrook v. Commissioner, T.C. Memo. 1993-383; sec. 1.183-2(a), Income Tax Regs.
Whether petitioners engaged in their Billenbrook Farm activity with the requisite profit objective is determined from the facts and circumstances of the case. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); *672 Ranciato v. Commissioner, supra; Holbrook v. Commissioner, supra; sec. 1.183-2(a) and (b), Income Tax Regs. More weight is given to objective facts than to petitioners' statements of their intent. Ranciato v. Commissioner, supra; Holbrook v. Commissioner, supra; sec. 1.183-2(a), Income Tax Regs. Petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The following factors, which are nonexclusive, aid in determining if an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status *673 of the taxpayer; and (9) elements of personal pleasure or recreation. Ranciato v. Commissioner, supra; Holbrook v. Commissioner, supra; sec. 1.183-2(b), Income Tax Regs. No single factor is dispositive, Golanty v. Commissioner, supra at 426; sec. 1.183-2(b), Income Tax Regs., and finding a profit objective does not hinge on the number of factors satisfied, sec. 1.183-2(b), Income Tax Regs.
With respect to the manner in which petitioners carried on the activity, one indicium of an activity engaged in for profit is a taxpayer's businesslike conduct of an activity. Sec. 1.183-2(b)(1), Income Tax Regs. This includes the keeping of complete and accurate books and records. Id. Petitioners kept very few records. In addition, petitioners did not keep each of their activities separate. They did not keep a separate checking account for Billenbrook Farm. Dr. Westbrook annotated each check with a description of the relevant activity, and sent the check to petitioners' accountant, Braden. The reports Braden produced in reliance on these checks contained numerous mistakes which *674 petitioners apparently did not correct; these mistakes resulted in various deductions related to petitioners' individual activities being taken on the return of Billenbrook Farms, Inc., and various expenses relating to Billenbrook Farms, Inc., being deducted on petitioners' Schedule F for Billenbrook Farm. Furthermore, petitioners engaged in extremely limited advertising of the Billenbrook Farm animals. Petitioners made no showing that they undertook a study of accepted business and economic practices with respect to raising horses and cattle. In preparing for an activity, a taxpayer need not make a formal market study, but should undertake a basic investigation of the factors that would affect profit. Underwood v. Commissioner, T.C. Memo. 1989-625; Burger v. Commissioner, T.C. Memo. 1985-523, affd. 809 F.2d 355 (7th Cir. 1987). Petitioners failed to do so. William prepared a preliminary outline, but petitioners did not undertake any market study or calculate the number of years it would take them to recoup their investment in the Billenbrook Farm activity. In addition, petitioners ignored *675 the years of losses they had had in their cattle operation at Burton Farm when they decided to raise cattle on Billenbrook Farm. Another factor the Court considers is the time and effort expended by petitioners in carrying on the activity. Sec. 1.183-2(b)(3), Income Tax Regs. Dr. Westbrook spent almost all of his time at the Clinic, where Mrs. Westbrook worked as well. Mrs. Westbrook's primary role in the family's business activities was to promote veterinary medicine and market the Clinic. Her public relations activities for the Clinic included newsletters, bringing animals to local schools, and recruiting television and newspaper reporters to come to the Clinic. Accordingly, petitioners spent relatively little time on their Billenbrook Farm activity. Another factor to consider is petitioners' expectation that assets used in the activity might appreciate in value. Sec. 1.183-2(b)(4), Income Tax Regs. Petitioners made no determination whether the animals on Billenbrook Farm would increase in value over time. Petitioners were not successful in the Billenbrook Farm activity. They never sold any of the miniature horses, and reported a series of losses from the Billenbrook *676 Farm activity. Petitioners had a similar lack of success with their Burton Farm activity. In fact, petitioners' success was in other areas, such as oil and gas and the Clinic. Petitioners earned no occasional profits from Billenbrook Farm. With respect to petitioners' history of losses from the activity, we note that losses due to fortuitous circumstances, such as depressed market conditions or disease, are not an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. However, there is no evidence of such fortuitous losses in the instant case, and losses continuing beyond the period customarily necessary to make the operation profitable, if not explainable, may indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. Petitioners made no showing that the years in issue fall within the beginning or startup phase of their Billenbrook Farm activity. See sec. 1.183-2(b)(6), Income Tax Regs. In addition, petitioners did not adopt different methods of running Billenbrook Farm to increase its profitability, which would be another indication of their profit motive. See sec. 1.183-2(b)(1), Income Tax Regs.
*677 With respect to elements of personal pleasure or recreation, the regulations state that "The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." Sec. 1.183-2(b)(9), Income Tax Regs. However, the mere fact that a taxpayer derives personal pleasure from engaging in an activity does not, in and of itself, mean that the activity is not engaged in for profit if other factors show otherwise. Id. A review of the entire record of this case in the context of these factors persuades us that petitioners did not engage in the Billenbrook Farm activity with the requisite profit motive. Billenbrook Farms, Inc.
Respondent argues that Billenbrook Farms, Inc.'s activities after February 1985, when petitioners disposed of their stock of dogs, were not engaged in for profit. Respondent concedes the deductibility of petitioners' share of losses for 1984 through February 1985, and petitioners' dog operation is not in issue. After February 1985, Billenbrook Farm, Inc., raised pygmy goats until it donated the goats to a tax-exempt organization no later *678 than September 1985. Petitioners did not introduce any evidence of books and records pertaining to the goats, any sales of goats, any instances of making an informed business judgment about them, any registration of the goats, or any plans to market them. Instead, the goats were used to promote the Clinic. Based on all of these facts and circumstances, and the factors discussed above, we find that Billenbrook Farms, Inc., was not engaged in an activity with the requisite profit objective after February 1985. [2]
*679 Deductions Erroneously Reported on the Billenbrook Farms, Inc. Return
Petitioners argue that certain expenses that were misclassified as expenses of Billenbrook Farms, Inc., and erroneously deducted on its Federal income tax returns, should nevertheless be deductible because Dr. Westbrook owns 100 percent of the stock of Billenbrook Farms, Inc. We disagree. Billenbrook Farms, Inc., is a separate taxpayer from petitioners. One taxpayer cannot deduct the business expenses of another, Hewett v. Commissioner, 47 T.C. 483, 488 (1967), and the payment by one taxpayer of the obligation of another is not generally an ordinary and necessary business expense, Deputy v. DuPont, 308 U.S. 488, 493 (1940); True v. United States, 93-2 USTC par. 50,461, 72 AFTR 2d 93-5660 (D. Wyo. 1993). Unfortunately for petitioners, having elected to incorporate Billenbrook Farms, Inc., they must respect its status as a separate taxpayer, and cannot "disown the burdens associated with [this choice]", True v. United States, supra, or enjoy the benefit *680 of some other route they might have chosen but did not, Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974). [3]
Expenses for Oil and Gas Royalties
Petitioners argue that some of their disallowed Burton Farm Schedule F expenses were incurred to protect their oil and gas royalties. However, petitioners presented no evidence that their oil and gas royalties bore any operating cost. The lease agreement provided that WCS had an exclusive oil and gas lease on Burton Farm "to produce, save, take care of, treat, process, *681 store and transport said minerals", in return for which petitioners were entitled to a royalty. Petitioners did not present any evidence that they had responsibilities under the lease that might require monetary expenditures or that they actually made such expenditures. In particular, petitioners do not claim there was ever any physical damage to their property related to the oil and gas wells. They do not claim that oil was ever stolen from Burton Farm. Thus, we uphold respondent's determination disallowing the claimed deductions for expenses related to petitioners' oil and gas royalties. Additions to Tax
Respondent asserted that petitioners' underpayment of income taxes in each year was due to negligence or intentional disregard of rules or regulations, and determined an addition to tax for negligence under section 6653(a)(1) and (2) for petitioners' 1984 and 1985 taxable years and under section 6653(a)(1)(A) and (B) for their 1986 and 1987 taxable years. For 1984 and 1985, section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence, and section 6653(a)(2) imposes an addition to tax *682 equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence. For 1986 and 1987, section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence, and section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence. Negligence includes a lack of due care or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proving that respondent's determination of negligence is erroneous. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). We find that petitioners presented insufficient evidence on this issue and sustain respondent's determination of additions to tax for negligence for all the years in issue. Respondent also determined that petitioners are liable for additions to tax for substantial understatement of tax under section 6661 for all taxable years in issue. The *683 amount of the section 6661 addition to tax for additions assessed after October 21, 1986, equals 25 percent of the amount attributable to the substantial understatement. Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002, 100 Stat. 1951; Pallottini v. Commissioner, 90 T.C. 498, 500-503 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). An understatement is reduced to the extent it is: (1) Based on substantial authority, or (2) adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2). Respondent's determination of an addition to tax for substantial understatements under section 6661 is presumed to be correct, and petitioners bear the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Sandvall v. Commissioner, 898 F.2d 455, 459 (5th Cir. 1990), affg. T.C. Memo. 1989-56. As petitioners presented no evidence on this issue, we sustain respondent's determination for *684 each year in which the Rule 155 computation reflects a substantial understatement within the meaning of section 6661. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. This amount is 50 percent of the interest on the deficiency.↩
2. Respondent was unable to determine this amount.↩
1. The parties filed three separate stipulations of settled issues, on Nov. 30, 1992; Feb. 16, 1993; and Sept. 20, 1993.↩
2. Even if the expenses of Billenbrook Farms, Inc., were generally deductible under secs. 162 and 183, Billenbrook Farms, Inc., would not be entitled to deduct William's compensation in excess of $ 10,000 annually, the amount allowed by respondent; petitioners did not present evidence that any larger portion of William's salary reflects work he performed for Billenbrook Farms, Inc. It appears that the remainder of each payment was a nondeductible personal expenditure. Sec. 262. Similarly, even if the expenses of Billenbrook Farms, Inc., were generally deductible, Billenbrook Farms, Inc., would not be entitled to deduct William's educational expenses because petitioners produced no evidence that they were ordinary and necessary business expenses. Petitioners made no showing that other corporations with an animal-breeding business would reimburse tuition for a master's in business administration. See Lewis v. Commissioner, 8 T.C. 770 (1947), affd. per curiam 164 F.2d 885↩ (2d Cir. 1947).
3. We note that if petitioners had properly substantiated these expenses, they could have deducted many, if not all of them on their individual tax returns, not as flow-through deductions from Billenbrook Farms, Inc., but as deductions related to income-seeking activity of their own. However, petitioners did not make this argument, and we decline to reach this issue on our own initiative; petitioners did not substantiate these expenses.↩